Below is an opinion of the court.

*David W. Hercher*
_____
DAVID W. HERCHER
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>**Portland Injury Institute LLC**,<br><br>        Debtor. | Case No. 21-30158-dwh7 |
| **Platinum Management Inc.**,<br><br>        Plaintiff,<br><br>    v.<br><br>**Binh Huu Do**,<br><br>        Defendant. | Adversary Proceeding No. 21-03045-dwh<br><br>**MEMORANDUM DECISION**[1] |

## I.   Introduction

This memorandum explains my decisions after trial in this action and in two main-case claim objections. References to papers by ECF number alone

_____

[1] This disposition is specific to this action and case. It may be cited for whatever persuasive value it may have.

Page 1 – MEMORANDUM DECISION

are to those filed in this action; references to papers by both the main-case

number, 21-30158, and ECF number are to those filed in the main case.

For the reasons that follow, I will (1) overrule the objection by defendant,

Binh Huu Do, to the proof of claim by Volodymyr Golovan and Platinum

Management Inc. and allow that claim in full; (2) sustain Platinum's

objection to Do's proof of claim unless he pays the transfer-recovery judgment

entered against him in this action; and (3) enter judgment in this action

avoiding the transfers in the amount of $100,887.51, granting Platinum

judgment against Do for that amount, and dismissing Do's counterclaims.

## II.   Platinum's proof of claim against the estate

### A.    Calculation of claim

Platinum's proof of claim is for $240,407, the sum of $54,000 claimed to be

due from PII monthly for June through November 2019, for a total of

$324,000. PII paid Platinum a total of $83,593.45,[2] leaving unpaid

$240,406.55, which Platinum rounded up to $204,407.

### B.    Documentation

In Do's objection, he says that the claim "arrearage" is incorrect, and the

claim lacks required documentation. He seeks complete disallowance of the

claim.[3]

---

[2] ECF No. 1 at 5 (checks 101, 103–05), 9 (checks 106, 109).
[3] No. 21-30158 ECF No. 74.

I agree with Platinum that failure to attach required documentation to a proof of claim is not a ground for disallowance.[4] Platinum explained in the response that the basis of the claim is the PII operating agreement. In conjunction with that response, Platinum filed Golovan's declaration, to which was attached a copy of the operating agreement in the form admitted at trial.[5]

### C. Do's challenge to Platinum's entitlement to $54,000 per month under the operating agreement

#### 1. The agreement's terms

At trial, I admitted in evidence the PII operating agreement offered by Platinum, marked as Exhibit H.[6] The terms of Exhibit H include the following:

- In section 2.1 on page 1, the membership interests were "reallocated" 51 percent to Do and 49 percent to Golovan.

- In section 8.1(d) on page 3, PII "hired" Platinum "to provide management, marketing, billing and other services" and agreed to "pay Platinum Management a flat fee of $50,000 a month for the services."

- Section 8.2 on pages 3 through 8 addresses dissolution of PII and withdrawal by either member.

  - In 8.2(c) on pages 3 and 4, Do agreed to certain procedures upon his withdrawal, including arranging for a replacement chiropractor during a six-month transition period.

  - In 8.2(d)(1) on pages 4 and 5, Do agreed that, if he were to withdraw without arranging for a replacement and remaining for the transition period, Golovan would have the

---

[4] No. 21-31058 ECF No. 84 at 3:10–17.
[5] No. 21-30158 ECF No. 85 Ex. 1.
[6] ECF No. 95-8 Ex. H; ECF No. 99-18 Ex. 18.

Page 3 – MEMORANDUM DECISION

right to buy Do's interest in PII for $1, and Do would "reimburse" Golovan for "any money that was paid to him [Do] since June 1st, 2019 as a profit distribution based on his 51% share of the profit."

- In 8.2(d)(1)(B) on page 5, PII would pay Platinum each month, in addition to the $50,000 management fee, "rental fee of $4,000 a month for the period of 60 months," and Platinum would rent premises from others and "sub-rent" it to PII.

Do agreed that he signed an operating agreement and that his signature on Exhibit H is his, but he contended that the bulk of Exhibit H was not present when he signed an operating agreement. Among other things, Do denied agreeing that Golovan would be a 49-percent member of PII or that PII would pay Platinum $54,000 per month. He did not offer a different form of the agreement. Nor did he say what terms were in the agreement he signed, other than that it was "very generic," was only about three pages long, and gave no ownership to Golovan. He testified the agreement he signed provided that Golovan would handle the "business side of the clinic," including "office expenses, leasing, hiring and firing, payroll, [and] billing person." Do agreed that "it was part of my agreement with Golovan that he [Golovan] would be reimbursed for his expenses" and that the "arrangement with Golovan was to split profits 50-50." Do didn't recall whether the agreement he signed had page numbers.

Golovan denied changing the agreement after Do signed it. He said that he "took a template from the internet" that was "very short and dry." He added section 8, entitled "Special Provisions," where he put provisions that he had discussed with Do "that would preclude, made him feel not interested in

Page 4 – MEMORANDUM DECISION

leaving." Those provisions include the $50,000 and $4,000 monthly payments due from PII to Platinum. According to Golovan, PII was also required to pay "all expenses, wages to workers, contractors, and various expenses related to ordinary items needed for the operation of the clinic, including soap detergents," and remaining revenues would be divided "51/49."

### 2. Authorship of the agreement

Two expert document examiners called by Do testified about Exhibit H. According to a report by James A. Green, the vertical line spacing on pages 1, 2, and 9 differs from that on pages 3 through 8, which "is indicative" that "the body of text" on pages 3 through 8 was "inserted into a prior document," retaining original pages 1, 2, and 9.[7] He used an "Electrostatic Detection Apparatus" to look for "indented writing," and there were "no indentations of value recovered from the agreement."[8] Also, "[a]ll pages of the agreement lacked staple holes."[9] He concluded that the line-spacing "inconsistency, by itself, did not permit an objective opinion [whether] the agreement was fabricated with deceitful intent or was the result of a simple blending of two work products into a single, legitimate document."[10]

According to the report of the second examiner, Gerald R. McMenamin, he identified differences between pages 1, 2, and 9, on one hand, and pages 3

---

[7] ECF No. 95-40 Ex. NN at 1 (executive summary).
[8] ECF No. 95-40 Ex. NN at 5 ¶ 4.
[9] ECF No. 95-40 Ex. NN at 5 ¶ 5.
[10] ECF No. 95-40 Ex. NN at 5 (conclusion).

through 8, on the other, regarding "systems for nesting and labeling subsections," "[f]orms for writing dates," "systems of writing numbers," and verb-tense use.[11] He concluded that the language "is internally inconsistent," and "[t]he inconsistencies of language and format are sufficient to bring into question its authorship, the conditions under which it was written, and the times of its creation."[12]

### 3.    Analysis and conclusion

Do's primary argument that I should disregard Exhibit H is that its business terms are so lopsided against him that no reasonable person in his position would have agreed to them, and thus that the only explanation for those terms is that they were added after he signed it. His secondary argument is that the document examiners' testimony demonstrates that the agreement was changed after he signed it.

I agree with Do that the agreement has terms that are extraordinarily advantageous to Golovan and disadvantageous to Do. But several things Do said or did, or failed to do, suggest to me that he likely did not read the agreement carefully before signing it. First, before beginning PII's business with Golovan, Do found his position as an employed chiropractor by looking for jobs on Craigslist, which does not suggest a high level of sophistication in business or professional matters. Second, both he and Golovan testified

---

[11] ECF No. 95-41 Ex. OO at 2 ¶ VI.
[12] ECF No. 95-41 Ex. OO at 2 ¶ IV.

consistently that Do relied on Golovan to handle essentially all aspects of PII's business other than the actual provision of chiropractic services to its patients. Do looked to Golovan to obtain leased space for PII, select, supervise, and arrange for compensation of PII's employees and independent contractors, and handle billing, which required substantial interaction with insurers. Third, Do's failure to keep a copy of the agreement after signing it reflects a lack of sophistication and care in business matters. Although I doubt that a typical health-care professional who is the sole, or even majority owner, of a health-care practice with staff would fail to carefully read an LLC operating agreement, I can envision that a professional with Do's approach to business matters doing so.

Just as Do says the terms of Exhibit H are ones that no one in his position would accept, the terms of the agreement he says he did sign are somewhat lopsided the other direction. According to Do, Golovan was responsible for all aspects of PII's business operation, but Golovan would be entitled only to reimbursement of expenses and the right to share any PII profits equally with Do. Golovan would use his efforts, presumably on a full-time basis, and Platinum would use capital to make those payments and expose itself to the risk that PII would not be able to reimburse those expenses, and they would receive no compensation for his efforts or the use of its capital and assumption of risk, other than his right to share any profit. It would be unusual for a businessperson in Golovan's position to agree to such an

arrangement. And I find that it would be especially unusual for those terms to be accepted by Golovan in particular; his testimony showed him to be sophisticated and earnest in the ways of advancing his own business interests.

Do's understanding that Golovan had no ownership interest in PII is undercut by several documents that Do or his lawyer signed.

- On April 23, 2020, Hendry sent Stephen Wilker, a Platinum lawyer, a letter referring to Do as "the majority member" of PII and enclosing a proposed PII member consent to be signed by both Do and Golovan.[13]

- On May 12, 2020, Hendry alleged in the initial Multnomah County complaint he filed on behalf of Do against Platinum (and PII) that Do is PII's majority owner"[14] and that "Golovan allegedly only had a minority interest in PII."[15]

- On August 18, 2020, Hendry repeated those allegation in the amended complaint he filed in that action, but added the allegations that "at no time did Golovan have an ownership stake in PII," and "PII was owned entirely by Plaintiff Do."[16]

- Also on August 18, Henry stated in a letter to Wilker that "Dr. Do is the 51% interest owner in PII . . .."[17]

- In November 2019, Do signed the Share Transfer Agreement drafted by Golovan, which refers to Do as holding "51% of shares" in PII and Golovan as "currently a 49% shareholder" of PII.[18]

Finally, the reports and testimony of the document examiners do not support Do's argument that Golovan modified the agreement after Do signed

---

[13] ECF No. 95-28 Ex. BB at 1.
[14] ECF No. 95-29 Ex. CC at 2 ¶ 5.
[15] ECF No. 95-29 Ex. CC at 3 ¶ 12(B).
[16] ECF No. 95-33 Ex. GG at 4 ¶ 15(A).
[17] ECF No. 99-4 Ex. 4 at 1 ¶ 2.
[18] ECF No. 99-10 Ex. 10.

it. Golovan testified that he was born and raised in Ukraine and that English is his third language. The examiners' observations about the line spacing and word choices on pages 3 through 8 are consistent with Golovan's testimony that he started with a template he found on the Internet and then crafted it based on his sense of the business deal he wanted. Green said that the agreement had "no indentations of value;" he also said that it had never been stapled, excluding the possibility that a stapled three-page document had been unstapled before being turned into one of nine pages.

I am unable to conclude from the agreement's lopsidedness in Golovan's favor or the examiner's comments that the agreement was modified after Do signed it.

### D. Conclusion

The operating agreement in the form of Exhibit H is genuine. PII is contractually obligated to pay Platinum the six monthly $54,000 payments that form the basis for the claim. The claim amount is the net due after crediting PII with its payments to Platinum.

I will overrule Do's objection to Platinum's proof of claim and allow it in full.

### III. Platinum's adversary claims against Do

#### A. *Avoidance of constructive fraudulent transfers under 548 and state law*

##### 1. Reasonably equivalent value

###### (a) *Reasonable-equivalence requirement*

Under both 548 and state law, for a transfer to be avoided as constructively fraudulent, it must have been made for less than reasonably equivalent value.[19]

###### (b) *Determination of reasonable equivalence*

Platinum contends that the transfers PII made to Do without receiving reasonably equivalent value total $105,703.61. That figure is the sum of $38,040.52 in legal fees,[20] $30,000 in distributions,[21] $23,360 in tax payments,[22] and $14,303.09 in other disbursements.[23]

###### (1) Legal fees

Of the legal fees totaling $38,040.53, $3,000 was paid to Matasaru,[24] and the balance of $35,040.53 was paid to James Hendry or his law firm, Brownstein Rask.[25] I agree with Platinum that legal services provided by both Matasaru and Brownstein were rendered primarily, if not only, to Do and are not properly charged to PII. Matasaru stated in letters that she had

---

[19] 11 U.S.C. § 548(a)(1)(B)(i); Or. Rev. Stat. § 95.240.
[20] ECF No. 97 at 2:7–8.
[21] ECF No. 97 at 2:8–9.
[22] ECF No. 97 at 2:9–10.
[23] ECF No. 113 at 10:14 – 11:2.
[24] ECF No. 99-2 Ex. 2 at 13.
[25] ECF No. 99-2 Ex. 2 at 14–17, 22.

"been retained to represent Binh Do, DC."[26] Do claims that Brownstein represented PII in defending wage claims against PII.[27] But PII engaged[28] and paid[29] the McGaughey Erickson law firm separately to represent PII on those claims, and Do offered no evidence in the form of Brownstein billing statements to demonstrate the amount of any fees attributable to representation of PII separately from Do. In the Multnomah County action initiated by Brownstein, Brownstein represented Do. The firm also named PII as a coplaintiff in the amended complaint, but after Platinum contended to Hendry that Brownstein could not represent both Do and PII,[30] PII engaged separate counsel.[31]

I agree that the challenged legal fees are not properly chargeable to PII.

### (2)  Distributions

The distributions totaling $30,000 are the sum of draws that Do took from PII on September 6, 11, and 27 and October 31, 2019.[32] LLC distributions are similar to corporate dividends; they are paid on account of ownership rather than any contractual obligation or debt, and the LLC receives no value, much less reasonably equivalent value, for them.

---

[26] ECF No. 99-5 Ex. 5 at 1; ECF No. 99-6 Ex. 6 at 1.
[27] ECF No. 107 at 4.
[28] ECF No. 99-4 Ex. 4 at 1–2 ¶¶ 1–2.
[29] ECF No. 99-2 Ex. 2 at 18, 20–21, 23, 25–26.
[30] ECF No. 95-32 Ex. FF.
[31] ECF No. 99-4 Ex. 4 at 1–2 ¶¶ 1–2.
[32] ECF No. 99-1 Ex. 1 at 5 ($2,200 check; checks 102, 107), 9 (check 110).ECF No. 95-42 Ex. PP.

**(3)    Tax payments**

The tax payments totaling $23,360 are the sum of the October 15, 2020, payment of $12,639 and the December 11, 2020, disbursement of $10,667. The statement descriptions are "IRS Usataxpymt . . . Binh H & Phuong Do."

Do does not explain why either (1) as a matter of law, a passthrough entity, such as PII (a limited liability company), receives reasonably equivalent value for paying the member's income tax on passed-through income or (2) in this particular circumstance, PII was received reasonably equivalent value for the tax payments. I agree with the 2014 holding of a Northern District of Illinois bankruptcy judge that an LLC's payment to members of enough cash to satisfy their tax liability is equivalent to a corporate dividend, the issuance of which provides no benefit to the LLC.[33] In 2021, a Delaware bankruptcy judge came to the opposite conclusion in *In re F-Squared Investment Management, LLC*,[34] but there, the tax distributions were "a bargained-for exchange in connection with a shareholder-approved conversion of [the debtor] from a corporate form to an LLC."[35] The debtor, a C corporation, considered converting to LLC form. Several shareholders were concerned that, as members, they would have pass-through tax liability regardless of whether the debtor disbursed its profits.[36] To obtain the

---

[33] *In re* SGK Ventures, LLC, 521 B.R. 842, 859 (Bankr. N.D. Ill. 2014). *See also In re* TC Liquidations LLC, 463 B.R. 257, 271 (Bankr. E.D.N.Y. 2011).
[34] 633 B.R. 663 (Bankr. D. Del. 2021).
[35] *F-Squared*, 633 B.R. at 665.
[36] *F-Squared*, 633 B.R. at 666.

shareholders' consent to the conversion, the debtor's postconversion operating agreement included a provision requiring the debtor to use its reasonable efforts to distribute cash sufficient to pay federal tax on the income allocable to the members. At least one of the members, whose vote was required, would not have voted for conversion but for the tax distribution assurance in the operating agreement.[37] In concluding that the debtor's tax distributions did not make the debtor or its creditors worse off, the court observed that, without the tax-distribution assurance, the debtor would have remained a C corporation, keeping the tax obligation at the entity level.[38]

Even if it were true in principle that a tax-passthrough entity receives reasonably equivalent value for paying tax on behalf of a member, Do has not provided satisfactory evidence that $23,306 is the correct amount of federal tax attributable to PII income allocated to him. First, he testified that he "asked my tax preparer what amount we should be paying based on that amount from PII and he gave me a rough number." Second, Do's Schedule C, Profit or Loss from Business, that he filed with his 2019 federal return[39] shows PII income of $80,303, but the certified public accountant called by Do concluded in his report that the Schedule C overstated Do's 2019 PII income by $23,613.22; it should have been only $56,689.78.[40] Third, even if the

---

[37] *F-Squared*, 633 B.R. at 667.
[38] *F-Squared*, 633 B.R. at 670–71.
[39] ECF No. 99-9 Ex. 9.
[40] ECF No. 95-42 Ex. PP at 2.

Schedule C were correct, I don't have the balance of Do's 2019 federal return to determine the amount of additional tax that he owed as a result of the PII income and to confirm that PII's payments totaling $23,306 to the IRS were assigned to his federal tax for 2019 even though paid in late 2020. To determine that those payments are the amount of his 2019 tax attributable to PII income would be speculation.

I find that PII did not receive reasonably equivalent value for the IRS payments.

### (4)    Other payments

The final category of PII payments challenged by Platinum are those "for personal travel, hotels, gas, groceries, restaurants, parking, debts, and unaccounted cash withdrawals," which it claims total $14,303.09.[41] Platinum supports that number with references to the dates of payments.[42] By my calculation, the sum of PII's disbursements from the Wells Fargo account on those dates, excluding the December 11, 2020, payment to the IRS and the October 21, 2019, payment to Platinum, is $9,486.99.

I agree with Platinum that the statement descriptions for those amounts do not allow me to find that they were incurred for the benefit of PII, rather than Do. Particularly, disbursements for Do's air travel, hotels, car rental, and parking, which he described as necessary to meet with lawyers, for

---

[41] ECF No. 113 at 10.
[42] ECF No. 113 at 10 n.1.

Page 14 – MEMORANDUM DECISION

payments to restaurants, gas stations, and grocery stores (such as H-Mart), all other disbursements in Washington State, and ATM and other cash withdrawals are not proper PII expenses.

### (5) Conclusion

The sum of Platinum's figures for legal fees, distributions, and tax payments, with which I agree, and my calculation of $9,486.99 for other expenses not properly chargeable to PII is $100,887.51.

Those transfers were made by PII to Do without receiving reasonably equivalent value.

## 2. Insolvency

### (a) *Statutory insolvency standards*

Under Platinum's second claim for relief, to avoid the transfers as constructive fraudulent transfers under 548(a)(1)(B), Platinum asserts that 548(a)(1)(B)(ii) is satisfied by the first of four alternate prongs, that PII was insolvent on the transfer date or rendered insolvent by the transfer. Under Platinum's third claim for relief, to avoid the transfers as constructive fraudulent transfers under 544(b) and 95.240, PII must have been insolvent on the transfer date or rendered insolvent by the transfer.

Under both bankruptcy and state law, a debtor is insolvent if its debts exceed its property at a fair valuation;[43] that test is sometimes described as

---

[43] 11 U.S.C. § 101(32)(A); Or. Rev. Stat. § 95.210(1).

the balance-sheet insolvency test. Under state law, a debtor is also presumed to be insolvent if it is generally not paying its debts as they become due.[44]

### *(b)    Determination of insolvency*

In overruling Do's objection to Platinum's proof of claim, I determined that PII owes Platinum $54,000 per month from June through November 2019, less the amounts of six payments by PII to Platinum totaling $83,593.45.

The only PII assets for which I have evidence is the amount of cash it held in its Wells Fargo account. The balance due from PII to Platinum exceeded the account balance initially by $54,000 (when the first payment became due), and after PII began receiving revenue in August 2019, the balance due to Platinum, after payments to it, always exceeded the Wells Fargo account balance by at least $122,982.14, the difference on September 26, 2019. Thus, without considering any other debt owed by PII, PII was balance-sheet insolvent at the time of each of the challenged transfers.

The insolvency conclusion wouldn't change even if I were to take judicial notice of the trustee's recovery of $13,053.50 of estate property; that amount is the sum of $9,850 of accounts receivable and $3,203.50 as the unused portion of the prepetition retainer paid to PII's bankruptcy law firm.[45] The conclusion would be even stronger if I were to consider as balance-sheet liabilities the wage claims asserted against PII. Wage claims were asserted in

---

[44] Or. Rev. Stat. § 95.210(2).
[45] No. 21-30158 ECF No. 68 Ex. B.

state-court actions against PII totaling $163,552, the sums of amounts sought, including statutory penalties but not attorney fees and costs, in state-court actions in Multnomah County ($125,552)[46] and Clark County, Washington ($24,000).[47] Although no wage claimant filed a proof of claim, I heard no evidence that the wage claims had been paid by anyone before the petition date, and PII's liabilities schedule E/F, signed by Do, lists each of the claimants as holding claims of unknown amounts.[48]

For avoidance claims under 95.240 and 544(b), insolvency is presumed if the debtor is not generally paying its debts as they become due. Because PII never generally paid Platinum as payments were due, insolvency is presumed, and Do did not rebut the presumption.

### 3. Alternatives to insolvency

In Platinum's complaint[49] and amended trial memorandum,[50] it relied on insolvency to satisfy 548(a)(1)(B)(ii). In Do's motion for judgment on partial findings filed on the last trial day, he argued not just against insolvency but also against two of the other three options for satisfying 548(a)(1)(B)(ii): that the debtor was, or was about to be, engaged in business or a transaction for which any property it had was an unreasonably small capital, and that the debtor intended to incur, or believed that it would incur, debts beyond its

---

[46] ECF No. 99-15 Ex. 15 at 6.
[47] ECF No. 95-31 Ex. EE at 2 ¶¶ 2D. and F.
[48] No. 21-30158 ECF No. 1 Sched. E/F items 3.1–3.4, 3.8.
[49] ECF No. 1 at 4:20 – 5:2.
[50] ECF No. 97 at 8:3–9.

ability to pay as they matured.[51] Platinum engaged with those additional arguments in its response.[52] In view of those party statements, I will treat those additional issues as having been tried by consent and otherwise proceed as if those issued were raised in the complaint.[53]

### (a) Capital sufficiency

Before PII opened its doors, it was bound by the operating agreement to pay Platinum $54,000 per month, and it never had sufficient funds to come close to being current on that obligation. The least amount by which the unpaid debt to Platinum exceeded the Wells Fargo account balance was $54,000 in June 2019. PII thus had unreasonably small capital.

### (b) Ability to pay debts

From the trial testimony, especially that of Do, I am unable to find that, at the time of the transfers, PII, or Do on its behalf, either intended to incur or believed that it would incur debts beyond its ability to pay as they matured.

### 4. Constructive-fraud avoidability of transfers under 548

PII received less than reasonably equivalent value for the transfers, which total $100,887.51. PII was insolvent on the date of each transfer or was rendered insolvent by the transfer. PII was engaged in business or a

---

[51] 11 U.S.C. § 548(a)(1)(B)(ii)(II), (III).
[52] ECF No. 113 at 12:10 – 13:8.
[53] Fed. R. Civ. P. 15(b)(2); Fed. R. Bankr. P. 7015.

Page 18 – MEMORANDUM DECISION

transaction for which its remaining property was an unreasonably small capital.

The transfers are avoidable under 548(a)(1)(B).

### 5. Constructive-fraud avoidability of transfers under state law

#### (a) 95.240(1)

For the same reasons that the transfers are avoidable as constructively fraudulent under 548, they are also avoidable under 95.240(1) and 544(b).

An avoidance claim under 95.240(1) is extinguished unless action is brought within four years after the transfer.[54] An action may be brought under state law and 544(b) if, at the petition date, the action could have been brought in state court. Because the transfers were made within four years before the petition date, they all may be avoided under 95.240(1) and 544.

#### (b) 95.240(2)

I find that PII had reasonable cause to believe that it was insolvent at the time of the transfers. Reasonable cause is an objective test, so it is unnecessary to establish that PII, or Do, subjectively thought or believed that it was insolvent.

An avoidance claim under 95.240(2) is extinguished unless action is brought within one year after the transfer.[55]

---

[54] Or. Rev. Stat. § 95.280(2).
[55] Or. Rev. Stat. § 95.280(3).

Page 19 – MEMORANDUM DECISION

Because I have separately held that all the transfers are avoidable under 544(a)(1)(B) and 95.240(1), I will not now calculate the subset of transfers that would be avoidable only under 95.240(2) and 544(b). I will do so later if necessary.

### B.     *Avoidance of intentional fraudulent transfers under 548(a)(1)(A)*

Platinum's first claim for relief seeks avoidance of the transfers as having been made by PII with the actual intent to hinder, delay, or defraud creditors, including Platinum and Golovan. Platinum's amended trial memorandum lists 11 badges of fraud recognized in *In re Lester*,[56] a 2020 decision of another judge of this court.

In Do's deposition, he testified that he realized that PII's bankruptcy was inevitable when "the wage claim" was filed.[57] Both of the two wage-claim lawsuits were filed on June 8, 2020. In light of PII's objective insolvency throughout the period of the transfers, I agree with Platinum that PII's transfers to Do thereafter were made with actual intent to hinder, delay, or defraud creditors.

Applying the badges of fraud, I find that—

- Do, the transferee, is a PII insider, satisfying badge 1;

- PII had been sued by the wage claimants, satisfying badge 4;

---

[56] 616 B.R. 549, 561 (Bankr. D. Or. 2020); ECF No. 97 at 7:18 – 8:2.
[57] ECF No. 99-21 Ex. 21 at 34 (deposition at 132:24 – 133:11).

- Do ended up emptying PII's bank account before the petition date, so the transfers were of substantially all of PII's assets, satisfying badge 5; and

- PII received no, much less reasonably equivalent, value for the transfers, satisfying badge 8.

Based on the application of those four badges, I conclude that the transfers on or after June 8 were made with the actual intent to hinder, delay, or defraud creditors.

Because I have separately held that all the transfers are avoidable under 544(a)(1)(B) and 95.240(1), I will not now calculate the subset of transfers that would be avoidable only under 544(a)(1)(B). I will do so later if necessary.

### C.    *Recovery of avoidable transfers*

A transfer avoided under 544 or 548, or its value is recoverable by the trustee from the initial transferee or the entity for whose benefit the transfer was made.[58]

Here, Do is the initial transferee or the entity for whose benefit the transfers were made, so the trustee may recover the transfers (they were in cash) from Do. Because the trustee assigned to Platinum his right to avoid and recover the transfers, Platinum may recover them.

### D.    *Accounting*

In Platinum's fifth claim for relief, it cites 11 U.S.C. § 323(b) as authority for its entitlement to an accounting of all expenses incurred and revenues

---

[58] 11 U.S.C. § 550(a)

Page 21 – MEMORANDUM DECISION

billed and collected after the share transfer[59] and an order requiring Do to repay monies he caused PII to wrongly distribute to him.[60] Platinum's trial memorandum says, "to the extent there are any funds Dr. Do received on behalf of [Platinum] or from [Platinum] that have not been disclosed to date, we ask the Court to order Dr. Do to account for such funds."[61]

Platinum appears to request relief under general principles of equity to resolve a dispute between Do and Platinum regarding money that Do might have received that rightly belongs to Platinum. That claim is outside the bankruptcy court's jurisdiction;[62] it is simply a state-law claim asserted by a nondebtor against a nondebtor and has no relationship to the bankruptcy case.

### E.  *Do's affirmative defenses to Platinum's adversary claims*

In Do's answer, he asserts three affirmative defenses.

### 1.  Unclean hands

Do's first affirmative defense is for unclean hands, alleging that Platinum "provided a false operating agreement and made fraudulent misrepresentations to" the trustee in connection with Platinum's proof of claim.[63]

---

[59] ECF No. 1 at 6 ¶ 42.
[60] ECF No. 1 at 6 ¶ 43.
[61] ECF No. 97 at 11:15–17.
[62] 28 U.S.C. § 1334(b).
[63] ECF No. 6 at 5–6 ¶¶ 22–25.

Page 22 – MEMORANDUM DECISION

A person to whom a claim is assigned obtains the claim precisely as it existed before the assignment—subject to exactly the same defenses as could have been asserted against the original holder of the claim if there had been no assignment. In this action, because the original holder of the claim was the trustee, Do can assert against Platinum only defenses that he could have asserted against the trustee. His unclean-hands defense, based as it is on Platinum's allegedly bad behavior, is ineffective against claims that Platinum has obtained by assignment from the trustee. And Do does not argue that the trustee committed any bad act that supports an unclean-hands defense.

### 2. Unjust enrichment

Do's second defense is unjust enrichment "by any recovery in this proceeding."[64]

This defense amounts to saying that Platinum should not be allowed to recover, even if its claims are sound, because it would be unfair to allow recovery for some reason. That's not a cognizable defense.

### 3. Illegality

The third defense is the alleged illegality of the agreement by which Platinum bought assets from the trustee, allegedly in violation of Oregon Administrative Rule 811-010-0120, which Do says prohibits majority ownership of a chiropractic business by a nonlicensed medical professional.[65]

---

[64] ECF No. 6 at 6 ¶¶ 26–29.
[65] ECF No. 6 at 6–7 ¶¶ 30–32.

Case 21-03045-dwh    Doc 114    Filed 03/31/23

In this action, Platinum pursues only avoidance and recovery rights it bought from the trustee. It is not pursuing any claim that turns on its acquisition of PII's chiropractic practice. Whether Platinum would violate Oregon law by owning or operating the practice has nothing to do with its right to exercise the trustee's avoidance and recovery rights. Even if Platinum's acquisition of PII's assets from the trustee is void under the administrative rule, nothing in the rule invalidates a contract by which one, such as Platinum, acquires other assets, such as the trustee's avoidance and recovery rights, that have nothing to do with owning or operating a chiropractic practice.

And even if it would be illegal for Platinum to own PII's practice, Do points to no provision of the rule that would invalidate a contract between a nonlicensee and a practice—even within an LLC's operating agreement—for the nonlicensee's provision of services to the practice. Thus, the rule does not invalidate Platinum's proof of claim or its indebtedness, which I have considered in determining PII's insolvency.

## IV.    Do's adversary counterclaims against Platinum

Do's counterclaims against Platinum are for breach of fiduciary duty and fraud.

Under 28 U.S.C. § 1334, this court has jurisdiction over claims that arise under the Bankruptcy Code, arise in a bankruptcy case, or are related to a bankruptcy case. Do's claims do not arise under the Bankruptcy Code, and

Case 21-03045-dwh    Doc 114    Filed 03/31/23

they did not arise in the bankruptcy case. Nor do they relate to the case, because there is no possible outcome of those claims that could have any effect on the bankruptcy case. These are state-law claims by a nondebtor against another nondebtor. They do not belong in bankruptcy court.

I will dismiss the counterclaims for lack of jurisdiction.

## V.     Do's proof of claim against the estate

Do's proof of claim for $46,014 says it's for "Services Rendered" to PII. Platinum objected to the claim because Do has received but hasn't returned recoverable avoidable transfers, and thus 11 U.S.C. § 502(d) requires that his claim be disallowed "unless [Do] has paid the amount" recoverable.[66]

Because I determined above that Do has received recoverable avoidable transfers, I will disallow the claim unless the amount of the transfers is paid to Platinum.

## VI.     Conclusion

I will overrule Do's objection to Platinum's proof of claim and allow that claim in full.

I will sustain Platinum's objection to Do's proof of claim and disallow the claim unless he pays the transfer-recovery judgment entered against him in this action.

---

[66] ECF No. 97 at 19:12–16.

Case 21-03045-dwh    Doc 114    Filed 03/31/23

I will enter judgment in this action avoiding the transfers in the amount of $100,887.51, granting Platinum judgment against Do for that amount, and dismissing Do's counterclaims.

### #